Case numbers 25-1965, 1969, 1978, and 1982, Juan Lopez-Campos v. Kevin Raycraft, et al. Oral argument not to exceed 15 minutes per side. Mr. Hayes for the appellants. Good morning, Mr. Court. Benjamin Hayes for the appellants. I would like to reserve three minutes for rebuttal. This case involves a straightforward question of statutory interpretation. AUSC Section 1225A deems all aliens who are present in the United States without having been admitted or who arrive in the United States to be applicants for admission. And Section 1225B2N provides that all such applicants for admission shall be detained pending their approval proceedings. As the Fifth Circuit held last month in Benrosco-Mendez, the statute mandates detention without bond of aliens who cannot show that they are entitled to be admitted regardless of how long they are in the country. Petitioners' contrary interpretation is not only a war with the statute's test, but would incentivize, directly incentivize, the evasion of immigration laws in the United States, which happens to be a criminal offense, and it would reimpose the exact regime that Congress tried to discard when it adopted Section 1225. Is our decision going to hinge on whether the petitioners are being processed or should be processed under Section 1225 or Section 1226? That's the number of the dispute, yes. Okay, well, how do you address that dispute? Well, so our position is that 1225B2A is the applicable provision because it requires that applicants for admission be detained for the duration of their approval proceedings. So in this case, petitioners do not dispute that they are applicants for admission under the statute. Under 1225B2A, they also do not dispute that they could not show, and did not show, that they are, as the statute says, clearly and beyond a doubt entitled to be admitted. But they do dispute whether they're seeking admission. Right. So that is the language involved in 1225B2A. Let me ask you just sort of a gateway question. You know, the government prevails on the position that mandatory detention is required for these 11 petitioners. Does the government have a position in terms of whether they'll be re-arrested or subject to re-arrest and mandatory detention? I assume the question is yes. I would think so. I mean, so the reason that they are not currently in detention is because of this report or that release. So as I understand from your friend on the other side, there might be two, three, four, five million people who entered the country without inspection, who, per the government's argument, would be subject to arrest and mandatory detention. Is that right? I may not be exactly sure that there are a large number of people. Millions of people. Sure, sure. You would think that Congress would signal in some way that this would be the sort of problem they signaled when they dealt with 1226C, I think, in terms of an exception for criminal. I mean, you're looking at, it sounds like, rounding up millions and millions of people who have been here for maybe 20, 25 years, arguably not seeking admission. You argue that they are per statute. But it just seems like that's going to be a massive undertaking. Well, so a couple things. So in terms of, did Congress signal this? We think yes, because that's the statute. But I think Your Honor's point is getting to the transition period that was provided for with respect to 1226C. But that was a much smaller number of people, right? Right. And so, I mean, I guess sort of the threshold point is I think the circuit was correct to say that in terms of trying to define Congress's intent there, I don't think there's really any indication at all, and that's not what the court should be doing. I do think there are big differences between the group of individuals who are subject to mandatory detention under 1226 and 1225D2. And I think there would be reasons why Congress would have been focused on allowing for a transition period there. So one of which is, of course, that the way 1226C is structured is it's essentially designed to be a handoff. There's a known group of individuals who are held in state and local law enforcement, and they are handed off mandatorily. And the government has a matter of discretion. It must take custody of these individuals. So there was a known stream. And so I think Congress could have focused on that and said, okay, well, we know that's going to happen. And I think that's in contrast to, you know, whether you encounter someone in the country, which may or may not happen. I'm not saying that that's purely discretionary, but I do think that's a big difference. And I also think there's a big difference between the type of people who are being detained under 1226. These are not, you know, just your average person who is in the country on walking. There are a lot of grounds under 1226 that are really serious criminals, human traffickers, drug traffickers, terrorists. And I would think Congress would be – you know, there's different detention facilities and structures that would be in place, and Congress would very well – I know you want to argue this is statutory construction, but these 11 petitioners do not have criminal records. I mean, maybe a traffic violation or two, right? No, I wasn't suggesting they do. All I was responding to was the fact that there was a transition period because a lot of these people are under 1226. Yeah, yeah. So, no, to be fair, and we have not argued that they fall under 1226C. We're just saying they fall under the detention authority in 1225D2F. I guess part of my question is just sort of a practical question. You know, if there are several million people who would be subject to mandatory detention under the government's interpretation, this new interpretation, I mean, where – there's not dead space. I mean, Congress was concerned before about, you know, facilities. You're talking millions of people. I know this – you want to talk about the African Court Commission, the Seeking Commission, and things of that nature, but it just seems to be – how would this even work? Well, practically speaking, I think there are far fewer in 1996, which is when this law was passed and became law. So in terms of there being a greater amount of debt, that's a question of resources, and Congress would have to provide for that. But I don't especially think, given that this law was passed, you know, 30 years ago, you know, there were a far fewer number there. And at the end of the day, Congress wrote that mandated law of detention, and if Congress didn't provide resources for bed space, like, that's something Congress should have done to align it to, but that doesn't mean that the statute doesn't say what it means. Is there really much of a difference? Practically, like – so it's presumptively mandatory detention, but I think you would concede that they would be eligible for parole under 182D2. At the exact discretion. Correct. So you could have gone about this – if your goal was for those folks that fall in this category to be detained, you could have gone about it this way, but a ward of 1226 essentially gives the attorney general discretion to choose between bond and detention. Historically, the attorney general has exercised the discretion to allow for bond in 1226, but why don't you just – no matter what happens here, why don't you go back tomorrow, change the reg, and say that presumption should be detention for immigrants who fall into this category? So I think it's correct that under statute, yes, 1226A does not require a bond here. That's a creature of regulation, and I suppose that is something the executive would do. Yes, but I don't think that necessarily plays into the statutory question here. Still, it would be discretionary there, and Congress would be the judge that wanted to have discretion. And it's somewhat discretionary here, too. There's a presumption of mandatory detention, so I agree that's not discretionary. But then there's a carve-out for parole, which strikes me as pretty discretionary for humanitarian reasons, and AG has historically exercised the discretion there to allow all children to be paroled, among other categories. Another issue you could expand back. So whatever we said here, the presumption on this could be bond parents in all cases either way. Well, I don't know. Certainly, I don't think parole would be – it is limited, as you say, to pretty extreme circumstances of the humanitarian. I'm not saying that doesn't cover a broad group of people, but with respect to a lot of individuals who are arrested in the United States without having been prevented, I don't think they would fall within the scope of the parole board. So they would be subject to mandatory detention. But if they were under 1226A and the bond, they're not exactly determined to help themselves. So I do think it matters, I guess. Now, if the government were to prevail in this argument, wouldn't we then run into a due process problem in that you have people subject to detention with no end point or no point in time when a due process hearing or bond hearing would be provided? I understand the government's position is that there is an end point to the detention because the end point would be when the deportation occurs or when detention is at an end. But we don't know when that would be. There's no requirement on the government to end the detention. So these people could potentially be held for months or even years without a bond hearing, without any kind of determination as to their status. Isn't that a due process problem with your position? Not with our position. So there are due process claims here. They are not duration of detention claims. So the due process claims the petitioners have brought here are claims that the mere fact that I'm detained for a debt without opportunity, bond, or an incest until my flight was for dangerousness creates a due process problem. That is the nature of their claim. Who can have their ages, petitions, and claims asserted there? They are not challenged the length of their detention. So that issue is separate. And, you know, it sounds more like Zadios, which could be held for indefinite detention. So I think that's a separate claim. But it's not one that's presented here. Their due process claims are purely – first of all, the district's holding was a due process holding that was just purely privileged statutory one. But theirs at its fullest is just a challenge to the fact that they're not having access to a hearing, even though they've been detained for a debt. So that's – But the natural implication is that they're not having access to a hearing. Subsequently, or at any time, is the natural consequence of the argument, even if you don't characterize it that way. Well, but I mean – so I understand Governor's question to be they would be detained indefinitely. And that would be a separate challenge to the length of their detention. But as to just their detention pending removal proceedings, I think that's a different question. If removal proceedings were over in a week, I don't think anyone would say that that raises a due process one of these concerns that Your Honor just raised. And I think the Supreme Court's decision, for example, in Moore v. Kim makes clear in a different statutory context what was dealing with mandatory detention under 12.6c and recognized the constitutionality of mandatory detention that is in fervorance of removal proceedings. And the statute here, 12.5b2a, only allows for detention pending removal proceedings. The authority to detain once there is a final order of removal disappears. It is not – it is not – it arises as removal detention. But there's no requirement as to when the removal proceedings have to occur. It doesn't say within a period of days. It only says a month. Well, so my understanding – and I don't – maybe there is. I'm not sure. So I have to be candid about that. But my understanding is when you're dealing with a detained case, in other words, an alien who is in detention as opposed to one who is out on bond, those are put on a priority list in terms of dealing with them first precisely because the alien is detained. I can't tell you exactly how long they take. I'm sure it's a case-by-case analysis depending on what forms of relief someone seeks and the facts of the case. But, again, I think that's a different claim than any due process pending review asserted here. There is nothing in their petition that suggests – or in their briefs that suggests a challenge to the length of their detention. It's all about I should get a volunteer to do the full stop. Can I ask a question? Sure. Can we go back to the statute, so 1225B2A? I think the best argument of your friends on the other side is when it says who is an applicant for admission, if the examining immigration officer determines they have an alien seeking admission, that Congress wrote it that way to suggest that you have to meet both qualifications, which suggests there's an alien seeking admission. Is doing something different than applicant for admission? Otherwise, we'd render it superfluous. And it wasn't obvious to me what your position was on this point. So is your position it was belt and suspenders and it is superfluous, therefore, you get to follow the plain text? Or is your position that alien seeking admission is doing something separate from applicant for admission, such as perhaps applicants for admission who want to leave the country, that they would not be seeking admission? So with respect to B2A, it's hard to talk about that provision without discussing the context, which is the 12.583, the provision that we actually have a lot of time to write, but the language or otherwise is a lot of attention and repeats. And so I think that understanding what seeking admission means starts with 12.583, because their interpretation of seeking admission is that the alien has to be, as they say, taking some kind of permanent vaccine, going out in search of and trying to acquire admission. That's what basically it means. And our position is that doesn't make any sense under 12.583, and the relationship that that clause establishes between applicants for admission and seeking admission. It says all applicants for admission, all aliens who are applicants for admission or otherwise seeking admission, etc., shall be inspected, and as 7th Circuit has held, as the 11th Circuit has held, I wonder. I got that. I'm just curious if you could say whether it's superfluous in this, meaning it's not doing any work other than applicant for admission in B2A, or whether it is actually limiting the number of applicants for admission to those seeking admission and what that would mean. So it's either superfluous or it's doing something, and I'm just curious what your position is. So if you accept our reading of A3, and so it would be that seeking admission is a somewhat broader category of alien than applicants for admission. So if you accept that, then I think it is not necessarily doing extra work, and I think it's a little confusing based on the way that 12.5 B2A is structured. So it's a little clunky, but I think the way it's supposed to operate is this. There is a primary, and as we relate to sovereign brief, there is a primary operative clause, which is doing the work, the if-then clause, if the examining immigration officer shall be detained. That's what's doing the work. There's a noun, the verb, the object, and so on. I think the two preceding clauses serve a narrowing or clarifying function. That's obviously true of the first subject to self-verification, B and C. It is carving out those that are contained within B and C from the scope of 12.5 B2A, and I think that's really how to understand the second clause in the case of an applicant for admission. I think that is serving a clarifying or narrowing function to confirm that it applies to certain cases, in which ones those involve applicants for admission, and that's... So what's your position on an applicant? So I think you're saying there's a thin diagram of seeking admission, and that applicant admission is within the bigger seeking admission. What's your position on an applicant for admission who shows up at the border, but then wants to withdraw the application and leave? That person would be an applicant for admission, I suppose, unless you grant the withdrawal request, but they wouldn't necessarily be seeking admission if they want to return to their home country. I think our position is, as long as they are an applicant for admission, they are deemed by operation of law to be seeking admission. Now, if they withdraw their application and leave, then they are neither arriving in the United States nor present in the United States, and they're not an applicant for admission. You're not claiming that these petitioners are seeking admissions. Are you in that none of them have applied for that, and if anything, I would imagine they're trying to avoid the idea of them seeking admission. They want to remain unnoticed by the government. If anything, that's the thing. Well, I certainly agree that they are not seeking admission according to their definition of return. I disagree that they are not seeking admission as that might be properly understood. As we discussed in our briefs, we think that the applicants for admission are necessarily seeking admission, and that's what 12.583 instructs. Now, I think your point about them trying to, these petitioners and others, trying to evade the immigration laws really does kind of showcase the really perverse incentives that their interpretation of the statute creates. Because under their interpretation of the statute, if the only people who are subject to mandatory detention are those who are going out in search of admission and trying to acquire admission, and admission is defined as lawful entry into the United States after inspection by an immigration officer, if those are the people who are subject to mandatory detention, then no one in his or her right mind is ever going to try to come into the United States by seeking lawful entry. They'll necessarily just try to evade inspection by immigration officers and bypass the entire inspection regime, because that's what the incentive structure of their interpretation encourages. Well, that's an enforcement problem. We have to come with what the statute requires. Well, I just want to say, and I think it is relevant to an understanding of the statute, because under their reading of the statute, their interpretation of seeking admission, it creates an incentive structure for aliens to evade inspection, which also happens to be a criminal offense under H.U.C. 1325a. So I think the outcome of their interpretation has to be taken into account when determining whether this statute is something Congress, that was passing a lie roll of all things, was seeking to achieve. Can I ask a question? Does the Jennings case give us any clarification? It seems to, at least as I read it, clarify that 1236 authorizes the government to detain non-citizens already in the country pending the outcome of the removal proceedings. So these 11 petitioners would be detained pursuant to 1236a and not 1252b-2a. So on Jennings, no, I don't think it's helpful. I think it's, I think it is, you know, I know courts would be able to look to Supreme Court data, but I don't think the data that my colleagues, my colleagues on that side will reply on is the kind that we would, because it's not data that arises in the context of the actual statutory analysis the court is conducting and may have been extraneous but still helpful. It's the statutory background section. It's just like setting up this overall framework and then the court addresses a question that's actually at issue. So none of that was relevant, but if you're going to look at language from Jennings, we're going to think that a particular from Jennings is useful. I'd encourage the court to look at pages 287 and 297. There's other places too, but in those portions, the court equates someone who's seeking entry with someone who is an applicant for admission. So I think there's, that is not consistent with the concept of seeking admission being some affirmative path. Thank you very much. Thank you. You're welcome. Now this side. Good morning. Good morning. You may proceed. Good morning, Your Honours. May it please the Court. My name is Holly Doe. I'm a petitioner at the police. I'd like to pick up on the conversation that we've been having and hone in on a few points. So I thought when the government is arguing that in 1996, Congress said that anyone from entry plan inspection, millions of people living in this country, must be locked up without any basic review over their detention. And that the only review that's available is by the jailer. But we know that's not what Congress did for three main reasons. First, through Section 1226, Congress made bond available to those who are arrested in the interior, like our petitioners. And at the same time, it limited no bond detention at 1225b2 to those who are at the border seeking admission into the country. And the government's interpretation would make a mess out of these statutes. Second, Congress told us what they were doing. And when it did enact new detention mandates, it not only was explicit, but it also delayed implementation because it was so concerned about the strain from that relatively modest increase. Which leads to my third point, that it made sense for Congress to keep bond available. The long-standing scheme has been to differentiate between those who are stopped at the border and those who are in the country. And mandating detention for millions of people would not only be a radical departure from that rule, but also, frankly, crash the system. Because what Congress set out was a mandatory detention scheme. And we expect the government to comply with that. I want to ask just a couple of clarifying questions about your position. So, the first is about the inspection regime, so 1225 and 83. If I read your brief correctly, you do not think there's a duty of inspection for immigrants unlawfully present in the country? So you read the phrase, all immigrants who are applicants for admission shall be inspected by immigration officers, not to include applicants for admission who are here illegally? No, Your Honor. Actually, on further reflection, we want to offer a different reading of 83. I think that's a good conclusion. Yes. And we actually think this supports the petitioner's position and shows why not all applicants for admission are seeking admission. So, 83 says, like Your Honor said, inspect all applicants for admission or those who are otherwise seeking admission, re-admission, or transit. The only way to avoid surplusage here is if there are some applicants for admission who are not seeking admission. Otherwise, that provision could simply just say inspect all aliens who are seeking admission, re-admission, or transit. The or otherwise there does not create a subset relationship. Instead, what it does is show overlap between applicants for admission and those who are seeking admission. Sure, there are some applicants for admission who are seeking admission. Those people must be inspected. However, there are also applicants for admission who are not seeking admission, and they must also be inspected as well. We think this gives... this interpretation gives meaning to all the words in that statute. And I'll point out that... So, bottom line is you think all applicants for admission must be inspected? Yes. And what that means is that simply the immigration officer, when they encounter that person, they determine whether they have moral status or not, and if they don't, they refer them to immigration proceedings in front of an immigration judge, where, like our petitioners, they are not seeking relief, not seeking admission. And the Supreme Court was very clear, in Sanchez v. Mayorkas, that lawful status is an entirely different concept from admission. Just because you gain lawful status does not mean that you get admission. That's another question I have for you. Imagine an immigrant at the border. They concede their inadmissibility, but they also apply for asylum. Asylum is separate from admission. So, it seems to me, under your view, even though that immigrant is at the border, the immigrant need not be detained because the immigrant isn't seeking admission because he or she is seeking asylum. No, Your Honor. So, someone who presents themselves to a court of entry, someone who crosses the border and goes up to an immigration officer, they are not trying to obtain inspection. But they're not seeking admission under your technical term because they concede their... My hypo is they concede they're inadmissible, which is one of the reasons listed in 182. They don't have travel documents or whatever. So, they're inadmissible. But they want asylum. It strikes me that they would not be seeking admission under your view because they can't get it because they can only grant asylum, which is, according to the board, grant asylum is not an admission. So, admission is not a substantive thing that you get. It's a mere procedure that you go through. So, somebody who is going up to a court of entry, going up to an immigration officer, they're submitting to an inspection. They are trying to get lawful entry. And this is entirely consistent with Petitioner's position, which is that admission must be given the meaning that Congress gave at 1101B13A, which is a lawful entry. But would they be admitted if they're seeking asylum? So, if they get a grant of asylum? No, Your Honor. People can be out... People are out for admission who seek admission who never get admitted. So, why would they be seeking admission if they concede that they can't be admitted? Because they are, consistent with the statute, seeking lawful entry. They're trying to enter and submitting to an inspection and authorization by an officer. It's a procedural matter. This is explained in the cases that the government cites. Kim Sung, the holder, as well as in Torres v. Barr. Those cases talk about how applicant for admission is a term of art. It includes people who are not making an application for admission. It just simply recognizes it's legal fiction. So, as I understand... So, that's another question I had for you. They have a significant superfluity argument and I think you have pointed out right beyond what seeking admission means. But what was the point of including, then, applicant for admission, those who are present here who have not been admitted? So, I think, Your Honor, you're asking what is the K-1 doing when it includes people who are here? They have a pretty compelling story, the government does, that those who illegally entered the country historically got benefits and it seemed quite unfair as compared to those who lawfully came here and tried to enter. Lawfully, they didn't get those benefits. So, in 1996, Congress was trying to fix the problem. They did it by equating the two. And I don't understand. So, they equated the two clearly in A-1. But under your view, that they're not seeking admission, what does A-1 actually accomplish? What does treating them as applicants for admission actually do? A-1 does a lot, Your Honor. And this is explained... Congress explained what they were doing. They were trying to change certain aspects of the entry doctrine, meaning that these individuals are now... they're not admitted, which means that they are subject to inadmissibility grounds, which are significant. There are more inadmissibility grounds than deportability grounds. The burden of proof is different. For instance, somebody can get inadmissible if the officer has a reason to believe they committed a crime. For deportability, you need to show a conviction. So, these are significant changes. But what Congress did not do was upend the detention rules. And they told us what they were doing. They said they were restating the prior provision that provided bonds for people who are unlawfully present in the country. And that includes individuals like our petitioners. And, Your Honor, you were talking about the incentive point. This is not about rewarding people with bond hearings. This is about whose detention Congress mandated. And we have to remember that mandatory detention is the exception in the interior. So when Congress wanted to do so, it did it for people with criminal histories, people with final orders, people facing fast-track deportation proceedings like expedited removal. That's the tool that Congress gave to the government to deal with recent border crossers. But what it did not do was say, you must lock up millions of people. And we're talking here about people like our petitioners who are long-time residents. They've been here for years and not decades. Several of them came as children. Two as young as 11 months old. They have families here. They have jobs. No criminal histories. Judge Kohl has mentioned that. And it is perfectly reasonable that Congress said, we won't take away the agency's discretion to release these individuals on bond. Do you have a position on what the parole statute means? This allows DHS to grant parole to any alien applying for admission. I'm curious. Do you think that parole can be granted to immigrants who are unlawfully present in the country? So that would be those who are not at the border. So immigrants who are in the country, are they applying for admission within the meaning of a bond agency? I think in practice, Your Honor, the government has exercised parole very broadly. So that's my point. What's your position on what applying for admission means in that? I think that is talking about, it's using a different phrase from seeking admission. It's using a different phrase from applicant for admission. So it must be doing something different, because those words have different meaning. I mean, seeking and applying, that strikes me as, your argument is applicant for admission is a term of art, and that we should interpret seeking admission not as a term of art, but we should interpret applying for admission as a term of art. No, Your Honor, sorry. That's not what I was implying at all. So I just, it seems to me we have to, whoever, if seeking admission means what you think it means, then I don't think individuals can be granted parole who are here present unlawfully. I mean, in practice, Your Honor, what the government has done is release them on conditional parole, which is covered in 1226.  But that's only subject to removal proceedings. As I understand, in 182, grant parole and removal proceedings can just be stayed, so that it seems like this is a significant benefit that would be taken away from immigrants who are in this country unlawfully if we adopt your view. No, I think, in practice, Your Honor, again, the government itself has said that it has to meet very high standards to grant humanitarian parole. We're not here talking about humanitarian parole. We're here talking about the bonds that is available to them. But I think we just have to, we have to interpret a provision of a statute to make it a coherent whole. And it just seems to me that there's symmetry between the two provisions, and they have to meet in the same frame. And so either seeking admission includes everybody, and applying admission includes everybody, or both exclude anybody here unlawfully. I agree, Your Honor, that you have to read the statute as a whole, and again, this is why only the teacher's interpretation is the correct one, because it gives meaning to all the words in the statute. And here, I want to bring you back to 1226, because, again, if you doubt the government's interpretation, you are nullifying whole parts of Section 1226. And the Supreme Court was very clear that this is not about mere redundancy. We're talking about rewriting the statutes, and you do not accept an interpretation that leads to nullifying whole parts of the same statutory scheme. Well, speaking of the Supreme Court, what's your view of Jennings and how it impacts the scope of 1225B and 1226? Yes, so the statements in Jennings explain who falls into what statutes. And we think whether or not it's dicta, it still is an explicatory decision on how the statutes work. And what's most relevant here are two things. First, the Supreme Court said, going off of what the Solicitor General said, under both the second Obama administration and the first Trump administration, that 1225B2 is the latest iteration of a statutory framework that applies to detention of people arriving at the border seeking admission. He said that very clearly. And that 1226 covers people who are already in the country. And as the SG said, both in oral argument and in briefing, that includes people like our contributors who entered without inspection. Second, I'll note that 1225B2, the discussion there, shows who is covered by that statute. It was talking about returning lawful permanent residence. Again, people who are at the border, at the port of entry, who are because of some sort of crime or because they abandoned their status, are deemed to be seeking admission as well as an applicant for admission. This is showing how there must be meaning given to both of those terms in order to fall within the mandatory detention scheme. And, Your Honor, I guess I want to go back to just the overall scheme of what Congress is doing here. Again, this is not about forewarning people with odd hearings or not. Congress was well aware of the number of people who are living here without inspection. The government really wants to make this a case about the border and recent border crossers. But what Congress did was say, sure, someone entered unlawfully, they can be subject to mandatory detention if they're placed into expedited removal. That's a tool that Congress gave to the executive to deal with recent border crossers. Do you think we should place significance on the fact that other provisions of 1225B2 do distinguish between arriving aliens and arriving immigrants, and immigrants present here a month later than 1225B2A does not? It seems to me that when Congress wanted to make a distinction between the two categories, they used a phrase like arriving aliens. No, Your Honor, for two reasons. So first, seeking admission is doing that work in B2. And we think it's more significant that B1, the expedited removal provision, explicitly refers to people who are present in the country. That is not included in B2. But I would draw the opposite. I mean, that would suggest when Congress wants to distinguish between the two groups that do so expressly, they want to use an opaque phrase like seeking admission. To the contrary, Your Honor. Seeking admission is a phrase that has been used in prior statutes. The law professor's amicus lays this out in great detail. And it was referring to people arriving at the border. And we presume that Congress knew about its prior statutes and that it's intentional when it keeps the same language that it was using before. And that's what seeking admission is doing at B2, is to limit it to people who are arriving at the border to seek a lawful entry, which, again, our clients have not. They've been here for years. They are seeking lawful status, not seeking admission. And I see I'm well over my time, if I can just close with two quick points. So first, I just want to acknowledge that we have the wife of one of the petitioners here, Mr. Contreras-Cervantes, whose wife is here, as well as two of their sons. And secondly, again, I just want to unpack and say that the government's position is that this statute is so clear, but I am not sure how that can be the case if five administrations, the Supreme Court, Congress, and the Lincoln-Riley Act, and since then, over 400 judges have said that no, Section 1226 is the only statute that applies to people like petitioners. Congress made that choice, and it is in keeping with a long line of precedence distinguishing between those arriving at the border, those in the country, and the executive cannot override that choice just because he doesn't like it. So we ask you to please check this executive overreach and affirm. Thank you. Thank you. We'll hear a vote. Thank you, Your Honor. Just a few points of rebuttal. To start at the top, I believe I heard Representative Underside talk about the fact that this long-standing distinction that existed in immigration law with respect to entry being sort of the point of demarcation between how you treat aliens, whether they're inside or outside. It should be very clear from reading the text of 1225 that Congress removed, eliminated entry as being the defining feature. There was a definition of entry in 1101, which is the definitional provision, which Congress repealed. It expressly put in place a definition of admission, and then adopted a definition of applicant for admission, which, as Your Honor has been discussing, includes people not just who have entered, but who are present in the United States without admission. That was the way that Congress was trying to put people on an equal footing, and entry was not a relevant point of distinction. A point was made about 12853, and that our interpretation would render applicants for admission in a certain usage. I believe that was the argument. You could just say seeking admission, since it's a broader catch-all category. And I encourage the court to look at the Eleventh Circuit's decision in Biddledale v. R. J. Reynolds. This is at page 964, where the court takes it on, instead of phrased or otherwise accurately operates as a catch-all. Specific items that preceded are meant to be consumed by outcomes accurately or otherwise blindly, so the candidates or bosses does not apply in this context. I think that's fully applicable here. The whole function of applying is to create a catch-all, which the students have the responsibility for. Legislative history was mentioned, and my friend mentioned some language from a committee report that refers to Congress's objective to just restate the prior detention authority that existed before. So I'd like to say two things on that. First of all, legislative history obviously cannot overcome clear statutes of protection. That's especially true when you're dealing with conflicting legislative history. So if you look only four pages sooner or earlier in that exact state committee report, Congress lays out its objective to eliminate the preferential treatment for aliens who are unlawfully present in the country. They were crystal clear about that and achieving it through the definition of admission and applicant for admission. Those two things cannot coincide. You cannot restate the prior authority and simultaneously abolish the entities that resulted from the prior authority. But more to the point, if it's in fact true that 12th and 16th just restated prior authority, then that comes in our favor, because the prior 1222 Act, old 1222 Act, starts off by referring to a determination of deportability. If all 1226 applies to our aliens who are subject to a ground of deportability, that is our interpretation of the statute, because those aliens have been eliminated and are deportable for some ground, having committed offense, or restated peace, or the like. So if you can reconcile the two, reconcile the two pieces of legislative history, they're reconciled in our favor. And I see my time is just about up on this fireside. Thank you, Court. We'll stop. Thank you very much. And the case is submitted. There will be no further cases for argument. Court may be adjourned. This honorable court is now adjourned.